THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KILROY & ASSOCIATES, INC.;<br>DANIEL P. ANDERSON,<br><br>Defendants. | Case No. C08-1019-JCC<br><br>ORDER |

This matter comes before the Court on Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 11), Defendants' Response (Dkt. No. 18), and Plaintiff's Reply (Dkt. No. 19). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS the motion for the reasons explained herein.

**I.   BACKGROUND[1]**

This action arose out of the sinking of the M/V FLORENCE FILBERG ("the Vessel"), owned by Defendants Kilroy and Associates, Inc. and Daniel P. Anderson (Resp. 1 (Dkt. No.

---

[1] Defendants have not submitted any factual material in response to this Motion. The Court has amassed this statement of undisputed facts from the record submitted by Plaintiff, including Defendant Anderson's full deposition transcript. Defendants have not pointed to any materials or allegations that would dispute those facts.

ORDER
PAGE - 1

18).)[2] On June 23, 2005, the Vessel sank at her moorings in the Lake Washington Ship Canal in Seattle. (*Id.*) According to the Coast Guard, after she sank, the Vessel discharged approximately 150–200 gallons of petroleum products into the marine environment, creating a surface "sheen" visible to the naked eye. (Grim Decl. ¶ 6 (Dkt. No. 12-1 at 2–3); Case Report (Dkt. No. 12-6).) The Coast Guard further estimated that there were approximately 1,700 gallons of petroleum products and diesel in the Vessel's tanks, and that the hull of the vessel was deteriorating. (*Id.*)

In his deposition, Defendant Anderson asserted that he arrived on-scene at around 6:30 or 7:00 in the morning on the day that the Vessel sank, and began making arrangements to raise the Vessel. (Anderson Dep. 39–40 (Dkt. No. 13-4 at 37–38).) He hired Ballard Diving and Salvage to raise the boat and contain the oil. (*Id.*) Based on calls made that morning, Anderson estimated the cost of the cleanup to be around $50,000 to $55,000. (*Id.* at 45 (Dkt. No. 13-5 at 5).) Anderson asserts that he was in the process of initial oil spill mitigation when the Coast Guard (or, "a gentleman in bicycle tights" who identified himself as Coast Guard) arrived mid-morning. (*Id.* at 41 (Dkt. No. 13-5 at 1).) That same day, Anderson signed a letter

---

[2] Kilroy and Associates, Inc., as a corporate entity, was dissolved in 1998; until that time, Daniel P. Anderson was its sole officer, director, and shareholder. (Anderson Dep. 34–37 (Dkt. No. 13-4 at 32–35); *see also* Wash. Corp. Record (Dkt. No. 13-10 at 1).) It appears as if the State dissolved the corporate form because Anderson failed to file necessary papers. (Anderson Dep. 32 (Dkt. No. 13-4 at 30).) Even after its dissolution, however, Kilroy and Associates, Inc. continued to be the record owner of the Vessel. (*See* Pollution Report (Dkt. No. 12-12 at 1).) Defendant Anderson asserted in his deposition that he did not know of the corporation's dissolution until he hired a lawyer to defend him in the instant action. (Anderson Dep. 36 (Dkt. No. 13-4 at 35–36 (Dkt. No. 13-4 at 33–34).) Under Washington law, "All persons purporting to act as or on behalf of a corporation, knowing there was no incorporation under this title, are jointly and severally liable for liabilities created while so acting . . ." Wash. Rev. Code § 23B.02.040. It is unnecessary for the Court to investigate whether Anderson acted knowingly in representing that the Vessel was owned by a Kilroy and Associates, Inc., however, because both Anderson and the Corporation have admitted that they, collectively, are the "responsible party" for purposes of the Oil Pollution Act, as discussed further *infra*. (Resp. 1 (Dkt. No. 18).) The Court assumes that this constitutes an admission that both Anderson and his corporation are jointly and severally liable under the Act.

ORDER
PAGE - 2

from the Department of Homeland Security alerting him to the possibility of federal assumption of the removal of the oil discharge. (Notice of Federal Interest for a Pollution Incident (Dkt. No. 12-7).) Later that same day, as the clean-up and salvage operation was underway, the On Scene Coordinator apparently determined that Anderson's actions were unsatisfactory. In a letter dated June 23, 2005, the Coast Guard notified Anderson that they had determined that Defendants' "limited financial status," indicated that Anderson and his contractor "could not come up with an adequate salvage plan to remove the pollution threat from the marine environment." (Notice of Federal Assumption (Dkt. No. 12-8).) Anderson acknowledges receipt of the letter, and subsequent materials indicating his responsibility for the clean-up costs; in his words, the Coast Guard had "fired" him from the clean-up and salvage site. (Anderson Dep. 46 (Dkt. No. 13-5 at 6).) From that point forward, the Coast Guard assumed primary responsibility for containing the harm from the Vessel's sinking, and contracted with a different salvage operation, Global Diving and Salvage, for the job. (*See* Global Invoice (Dkt. No. 12-9).) Global charged the Coast Guard $381,842.38 for "environmental emergency response services." (*Id.*) This, coupled with other assorted costs, resulted in a total bill of $421,880.32. (National Pollution Funds Center Bill (Dkt. No. 13-7).)

The Coast Guard later submitted a Marine Information for Safety and Law Enforcement ("MISLE") Case Report that determined that the incident had resulted in a "discharge or substantial discharge of oil." (Dkt. No. 12-4 at 3) (hereinafter "MISLE Case Report"). According to its investigation, the Vessel's hull had rotted or deteriorated over time, which resulted in the Vessel taking on water and eventually sinking. (*Id.* at 7.) However, the Coast Guard also noted that the "[e]xact cause of the flooding and the subsequent sinking could not be determined." (*Id.* at 9.) In response to a question regarding the condition of the Vessel before she sank, Defendant Anderson responded that "Prior to me buying it, she had . . . had the hull inspected, wood samples taken and came back. I had the survey report before I bought it. It was not pretty." (Anderson Dep. 56 (Dkt. No. 13-5 at 16).) However, Defendants

have not agreed that the cause of the sinking was deteriorating wood in the hull of the vessel, and have asserted, as an affirmative defense in his Answer, that the cause of the damage was the acts of third parties. (Ans. 5 (Dkt. No. 9).) In his deposition, Anderson alluded to these third parties, and mentioned that numerous items had been stolen off the Vessel in the time leading up to the incident. (Anderson Dep. 61 (Dkt. No. 13-5 at 21). He also asserted that, the day before the Vessel sank, he found a sleeping bag and syringe on board. (*Id.* at 61–62 (Dkt. No. 13-5 at 21–22).) Anderson does not know who the third parties who might be responsible are, however, and he also asserted elsewhere that he did not know why the vessel sank. (*Id.*; *see also id.* at 25 (Dkt. No. 13-4 at 23).)

Presumably, Defendants have not reimbursed the Coast Guard for the cost of the federal clean-up effort, and this action ensued.

## II. DISCUSSION

### A. Summary Judgment, Generally

Under Federal Rule of Civil Procedure 56(c), the Court shall grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Summary judgment under Rule 56(c) is appropriate against a nonmoving party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). That is, after the movant has carried its burden of demonstrating that there is no genuine issue of material fact, the burden shifts to the nonmovant, who must present a quantum of evidence such "that a reasonable jury could return a verdict" in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52 (1986). In determining whether summary judgment is appropriate, the Court must view the facts in the

light most favorable to the non-moving party and draw reasonable inferences in favor of that party. *Scheuring v. Traylor Bros., Inc.*, 476 F.3d 781, 784 (9th Cir. 2007).

That said, as the Supreme Court has repeatedly counseled, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007). When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). And beyond this, courts have long held that "mere denials, unaccompanied by any facts which would be admissible in evidence at a hearing, are not sufficient to raise a genuine issue of fact." *Piantadosi v. Loew's, Inc*., 137 F.2d 534, 536 (9th Cir. 1943).

The Court takes this opportunity to observe Defendants' strategy in defending against this Motion. Rather than contest Plaintiff's factual or legal assertions, Defendants have chosen instead to admit that (1) they were the owner of the Vessel at the time of the accident, (2) that the Vessel sank at its moorings on June 23, 2005, and that (3) Defendants are the "responsible party" for purposes of the Oil Pollution Act, a concession discussed further *infra*. (Resp. 1 (Dkt. No. 18).) Defendants go on to say that they "do not concede and reserve for further proceedings all other issues including the appropriateness of all of the damages." (*Id.* at 2.)

The Court commends Defendants for their choice to eschew unnecessary litigiousness on undisputed issues, but is concerned that this approach may be more cavalier than Defendants intended. In the first place, Plaintiff has moved for summary judgment on a broader swath of issues than those conceded by Defendants, including Defendants' affirmative defenses. (*See* Mot. 10, 17 (Dkt. No. 11 at 17, 24).) Because Plaintiff has so moved, the Court must consider these issues for summary adjudication. In response to a properly supported motion, Defendants' formulaic, answer-like denials are not sufficient to preserve argument for a later time. *See Anderson*, 477 U.S. at 256 ("Instead, the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment."); *Pitandosi*,

ORDER
PAGE - 5

137 F.2d at 536.[3] Conversely, Defendants' Response also contains more than it needs. In this Motion for *Partial* Summary Judgment, Plaintiffs have moved only for a conclusive determination of liability under the OPA. (Mot. 1 (Dkt. No. 11 at 8).) Damages, and any other issue not briefed by Plaintiffs, are not the subject of this Order, and would be reserved without express mention by Defendants. (*See also id.* at 4 n.2 (Dkt. No. 11 at 11).)

The Court must assume that Defendants are aware of their burden in challenging a properly supported motion for summary judgment and have considered the merits and pitfalls of their strategy. Nonetheless, the Court proceeds through the following analysis with caution, as the factual materials before it are conspicuously one-sided. The outcome here is commanded in large part by the procedures announced by the Supreme Court in *Matsushita*, *Celotex*, and *Anderson*: Plaintiffs will prevail on this motion because they have carried their burden, and Defendants have not carried theirs.

### B. Prima Facie Liability under the Oil Pollution Act

Under the Oil Pollution Act ("the OPA"), parties responsible for oil spills are strictly liable for damages caused by the spill, subject to certain exceptions. *See* 33 U.S.C. § 2702(a), *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1052 (9th Cir. 2003). The statute provides:

> Notwithstanding any other provision or rule of law, and subject to the provisions of this Act, each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages specified in subsection (b) of this section that result from such incident.

Courts in the Ninth and other circuits have held that liability under the OPA is strict. "Parties responsible for oil spills are strictly liable without regard to fault for damages caused by the spill, subject to certain exceptions." *Clausen*, 339 F.3d at 1052; *see also Complaint of Metlife*

---

[3] The Court also notes that this District's Local Rules allow the Court to assume that a failure to file papers in opposition to a motion represents a concession that the motion has merit. *See* Local Rules W.D. Wash. CR7(b)(2).

ORDER
PAGE - 6

*Capital Corp.*, 132 F.3d 818, 820–21 (1st Cir. 1997) (the "OPA imposes strict liability for pollution removal costs and damages on the "responsible party" for a vessel or a facility from which oil is discharged.") According to the terms of the statute, then, Plaintiffs must show (1) that Defendants are the "responsible party"; (2) that oil was discharged or that the incident posed a substantial threat of a discharge of oil, (3) that the actual or threatened discharge occurred in navigable waters or adjoining shorelines. If they have done so, based on undisputed facts, they have made out a *prima facie* case for liability.

### 1. Responsible Party

Defendants have conceded that they are jointly the "responsible party" for purposes of the OPA. (Resp. 1 (Dkt. No. 18).) The Court need not discuss this element further.

### 2. Actual or Threatened Discharge of Oil

Strict liability under the OPA is triggered by one of two events; either the "discharge," or the "substantial threat of a discharge," of oil into navigable waters or other selected water bodies. 33 U.S.C. § 2702(a). The test is disjunctive; either will suffice to trigger the liability provisions of the OPA. In this case, Defendant Anderson admitted that he saw oil on the surface of the water when he arrived on-scene at the site of the sinking. (Anderson Decl. 49 (Dkt. No. 13-5 at 9).) According to Defendant Anderson, the "sheen" was all within the containment booms, approximately ten to twelve feet from the boat, and the oil in the water was "extremely minimal." (*Id.*) The Coast Guard also observed a visible sheen of oil on the surface of the water, (Grim. Decl. ¶ 6 (Dkt. No. 12-1 at 2–3)), and later determined that approximately 150 gallons of oil were actually discharged into the Lake Washington Ship Canal as a result of the incident. (MISLE Case Report 9 (Dkt. No. 12-4).)

Under the OPA, "discharge" is broadly defined as "any emission (other than natural seepage), intentional or unintentional, and includes, but is not limited to, spilling, leaking, pumping, pouring, emitting, emptying, or dumping." 33 U.S.C. § 2701(7). There is no requirement that any particular amount of oil be discharged before the statute's liability

provisions are triggered. It is undisputed in the record before the Court that oil was discharged from the sunken Vessel. (Grim Decl. ¶ 6 (Dkt. No. 12-1 at 2–3); Case Report (Dkt. No. 12-6); Anderson Decl. 49 (Dkt. No. 13-5 at 9)).) Even if, as Anders on asserted, the amount of oil discharged was *de minimis*, this fact is immaterial because the statute seems to impose liability for even a single drop of discharged oil into a navigable waterway. Accordingly, the oil spill of 150 gallons is sufficient, under the OPA, for liability to attach.[4]

And even if the "actual discharge" test did not apply in this case, the Coast Guard reported over 1,700 gallons of petroleum products and diesel in the deteriorating hull of the Vessel. (MISLE Case Report 9 (Dkt. No. 12-4); Grim Decl. ¶ 7 (Dkt. No. 12-1 at 3).) The Coast Guard could have reasonably determined that this situation presented a "substantial threat" of discharge of oil. *See* 33 U.S.C. § 2702(a).

Importantly, review of this administrative decision is extremely curtailed. As the Ninth Circuit counseled in a case remarkably analogous to the one at bar, "the OPA does not restrict the recovery of the United States to costs that were prudent, necessary, or reasonable." *United States v. Hyundai Merch. Marine Co.*, 172 F.3d 1187, 1191 (9th Cir. 1999). In *Hyundai*, the Ninth Circuit rejected the defendant's contentions that it should not be liable for clean-up costs because the United States' recovery efforts were not necessary to mitigate or prevent a discharge of oil. *Id.* The Ninth Circuit refused to require that actions be necessary to prevent

---

[4] Even if the amount of oil spilled were at issue, courts applying the Clean Water Act, 33 U.S.C. § 1321(b)(1), have applied a "sheen" test to determine the presence of a "harmful quantity" of oil. *See United States v. Slade, Inc.*, 447 F.Supp. 638, 642 (E.D. Tex. 1978) ("It is not necessary that the precise gallon amount of the spill be established, a sufficient amount unquestionably having been discharged to cause 'a film or sheen upon . . . the surface. . . . The so-called 'sheen test', set forth at 40 C.F.R. § 110.3(b), has consistently been upheld by the courts as a measure of the statutory 'harmful amount.') (citing cases). The OPA does not contain CWA's "harmful quantity" language, but the conclusion here is instructive. Even under a statute that *does* hinge liability on a particular quantitative determination, the amount of oil spilled in this case—which left a visible sheen on the surface of the water—would be enough to trigger liability.

ORDER
PAGE - 8

the threatened discharge. *Id.* Instead, the proper standard under which to evaluate the government's efforts is the "arbitrary or capricious" standard articulated in the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

Generally, because an agency's discretion is presumed to be valid, a party challenging an agency action bears the burden to prove that the action was arbitrary, capricious, or an abuse of discretion. *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 (1971); *United States v. Chapman*, 146 F.3d 1166 (9th Cir. 1998) (evaluating burdens under repayment provisions of CERCLA); *Lands Council v. Vaught*, 198 F. Supp. 2d 1211, 1221 (E.D. Wash. 2002). Although the Court can find no Ninth Circuit case law interpreting the OPA on this precise subject, it stands to reason that this principle is true even where the government is a plaintiff, and even where the issue is presented on the government's motion for summary judgment, because Defendant would still bear the burden on this issue at trial. *See Celotex*, 477 U.S. at 322; *see also United States* v. *Newmont USA Ltd.*, 504 F. Supp. 2d 1077, (E.D. Wash. 2007) (defendant who was potentially responsible for government response costs under CERCLA had burden of proving that EPA action was arbitrary or capricious, on government plaintiff's motion for summary judgment). Given that Defendants have not submitted any material to the Court that would call into question the decision of the Coast Guard that the Vessel presented a "substantial threat" of discharge, they have not carried their burden on this issue, and summary judgment is appropriate. *Celotex*, 477 U.S. at 322.

Even assuming *arguendo* that the Court is equipped to investigate whether the Coast Guard's decision was arbitrary and capricious, "[t]he court is not empowered to substitute its judgment for that of the agency." *Overton Park*, 401 U.S. at 416. All that is required of an agency is that it "articulate a rational connection between the facts found and the choice made." *Bowman Transp. v. Arkansas-Best Freight Sys.,* 419 U.S. 281, 285 (1974). Here, the MISLE Case Report articulated both that the hull of the Vessel was rotting, and that there was a substantial amount of oil inside the sunken ship. (MISLE Case Report 9 (Dkt. No. 12-4);

Grim Decl. ¶ 7 (Dkt. No. 12-1 at 3).) This is enough of a rational connection. The decision of the Coast Guard that the sunken ship posed a "substantial threat" of oil discharge must be upheld on summary judgment.

Accordingly, Plaintiff has carried its burden on this issue. The undisputed facts show that the oil released by the Vessel's sinking, and the substantial threat of the discharge of more oil, are independently sufficient to trigger the liability provisions of the OPA.

### 3. Navigable Waters

Neither party has discussed whether Lake Washington Ship Canal is a navigable waterway, presumably because the answer is obvious. The Supreme Court set forth the Commerce Clause standard for navigable waters in *The Daniel Ball,* 77 U.S. (10 Wall.) 557 (1870). Waters are navigable "when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes . . . on water." *Id.* at 563. The Lake Washington Ship Canal is, to state the obvious, a canal used by ships. *See also Save Lake Washington v. Frank*, 641 F.2d 1330 (9th Cir. 1981) (discussing the safety record of vessels crossing the Ship Canal).

### C. Affirmative Defenses

Plaintiff has submitted enough factual material, undisputed by the record or by Defendant, to make out a prima facie case for strict liability under the OPA. Plaintiff also moves the Court to consider the exceptions enumerated in the statute, and determine that none applies. (Mot. 17 (Dkt. No. 11 at 24).)

The OPA contains three "complete defenses," on which the responsible party bears the burden of proof. If the responsible party establishes by a preponderance of the evidence that the discharge of oil and resulting damages or removal costs were caused *solely* by (1) an act of God, (2) an act of war, or (3) an act or omission of a third party, subject to additional conditions, or (4) any combination of the three, then the responsible party is not liable for removal costs or damages under the OPA. 33 U.S.C. § 2703(a) (emphasis added). Although

Plaintiff briefed the act of war and act of God defenses, Defendants did not assert either in their Answer. Thus, the Court need only discuss the third-party defense, which Defendants did raise. (Ans. Defense F (Dkt. No. 9 at 5).)

The applicable portion of the statutory third-party defense reads as follows:

> A responsible party is not liable for removal costs or damages under section 2702 of this title if the responsible party establishes, by a preponderance of the evidence, that the discharge or substantial threat of a discharge of oil and the resulting damages or removal costs were caused solely by--
>
> **(3)** an act or omission of a third party, . . . if the responsible party establishes, by a preponderance of the evidence, that the responsible party--
>
> > **(A)** exercised due care with respect to the oil concerned, taking into consideration the characteristics of the oil and in light of all relevant facts and circumstances; and
> >
> > **(B)** took precautions against foreseeable acts or omissions of any such third party and the foreseeable consequences of those acts or omissions . . .

33 U.S.C. § 2703(a)(3). Because Defendants bear the burden of proof on this affirmative defense, Plaintiff must show that, based on undisputed facts, Defendants would not be able to carry their burden at trial on this element. If they do so, the burden shifts to the Defendant to make an affirmative showing to the contrary. *Celotex*, 477 U.S. at 322.

Plaintiffs have met their burden here. They correctly point out that the only evidence on the record that even circumstantially could implicate a third party is the mysterious sleeping bag and syringe found on board the Vessel the evening before she sank, as well as Anderson's assertions of a number of thefts, including a bronze porthole and a number of doors. (Anderson Dep. at 61–65 (Dkt. No. 13-5 at 21–25).) But these reports only point to the presence of third parties *around* the Vessel, not to those parties' *sole responsibility for the Vessel's sinking*, as required by the statute. These randomized, hypothetical accounts of third-party presence are insufficient to raise a genuine issue of material fact that the *only* reason the Vessel sank was an act of a third party. *See United States v. W.R. Grace & Co.*, 280 F. Supp. 2d 1135, 1147 (D. Mont. 2002) (analyzing nearly identical third-party defense under CERCLA, 42 U.S.C.A. § 9607(b)(3), and determining that responsible party's assertions of third-party involvement were

ORDER
PAGE - 11

"hypothetical, are unsupported in the record, are insufficient to raise a genuine issue of fact, and, therefore, are insufficient to defeat summary judgment.") Plaintiffs have demonstrated that there is nothing in the record that would create a genuine issue of fact as to whether the cause of the sinking was solely an act of a third party. Instead, the Court finds that the intimation that a vagrant sank the ship to be a "metaphysical doubt" that is contradicted by the overwhelming weight of the evidence that it was, most likely, the hull's deteriorated condition that led to the Vessel's sinking. *See Matsushita*, 475 U.S. at 586. The record that underlies the third-party defense does not raise a "genuine" issue of material fact. Accordingly, because Defendants have not carried their shifted burden under *Celotex*, summary judgment is appropriate on this affirmative defense.[5]

### III. CONCLUSION

Based on undisputed facts, Plaintiff has demonstrated a prima facie case for liability under the OPA, and Defendants' asserted affirmative defense of third-party liability is insufficiently supported to survive summary judgment. Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 11) is therefore GRANTED.

DATED this 30th day of October, 2009.

John C. Coughenour
UNITED STATES DISTRICT JUDGE

---

[5] Because the Court finds that there is no evidence in the record that would indicate that a third party was the "sole" cause of the oil discharge, the Court need not investigate whether Defendants exercised due care with respect to the oil, and took precautions against third-party interference. 33 U.S.C. § 2703(a)(3)(A–B).